**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **BARBARA DAVIS ON BEHALF OF D.D.**, | : | Case No. 1:11-CV-2749 |
| Plaintiff, | : | |
| v. | : | |
| **COMMISSIONER OF SOCIAL SECURITY**, | : | **MEMORANDUM DECISION & ORDER** |
| Defendant. | : | |

Pursuant to 42 U.S.C. § 405(g), Plaintiff Barbara Davis, by and on behalf of her daughter, DD, seeks judicial review of Defendant's final determination denying DD's claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act).  Pending are the parties' Briefs on the Merits (Docket No. 20 & 21).  For the reasons that follow, the Magistrate reverses the Commissioner's decision and remands the case to the Commissioner for further consideration consistent with this Memorandum Decision and Order.

## I. PROCEDURAL BACKGROUND

On March 10, 2009, Plaintiff filed an application for SSI alleging that DD became disabled on February 15, 2007.  The application for SSI was denied initially and upon reconsideration (Docket No. 12, pp. 83-85, 89-91, 93-95 of 352).  Administrative Law Judge (ALJ) Whitfield

Haiger, Jr., conducted a video hearing on November 18, 2010 and he rendered an unfavorable decision on February 7, 2011 (Docket 12, pp. 12-26, 31 of 352).  On October 24, 2011, the Appeals Council denied Plaintiff's request for review (Docket 12, pp. 5-7 of 352).  Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision (Docket No. 1).

## II. FACTUAL BACKGROUND.

Plaintiff  DD and their counsel, Emily Warren, appeared for a hearing in Cleveland, Ohio. The ALJ was in the National Hearing Center in St. Louis, Missouri.  Plaintiff's sworn testimony was elicited during the hearing.  DD did not testify.

Plaintiff stated that she first noticed DD's misbehavior during preschool.  A year prior  to the hearing, DD's behavior had become uncontrollable. DD fought, threw tantrums, became violent and displayed physical aggression toward others.  Without provocation, she would punch, kick or smack her brother.  During the month preceding the hearing, DD approached Plaintiff with a pen and brandished it as if to stab her mother.  Plaintiff pushed DD down on the floor and grabbed the pen.  DD had a tantrum.  Plaintiff attributed this assault to her failure to accede to DD's wishes (Docket No. 12, pp. 37-38, 39, 54 of 352).

Plaintiff described DD as a bright young lady who excelled academically but she had poor behavioral control.  During her fifth grade school year, DD got into at least four fights, including verbal and physical altercations.  Plaintiff recalled that she received several calls from the school administrators about DD's inability to focus or follow the rules.  During her sixth grade school year, DD earned good grades.  During the first quarter of school, DD had already been disciplined for

bullying a teacher, talking about her, getting "in her face," and calling her "ugly" (Docket No. 12, pp. 40, 41, 42 of 352).

DD had been prescribed medication to control her sleep and wake cycles and to treat symptoms of a bipolar disorder.  The side effects of these medications included drowsiness.  There had been times when Plaintiff was unable to successfully administer the drugs without a fight.  In fact, during the course of intensive treatment at the Applewood Center, an agency dedicated to providing behavioral health services for children, DD absconded.  DD now saw a psychiatrist monthly and a therapist weekly.  She was on a waiting list to obtain more intensive therapy (Docket No. 12, pp. 43, 44, 45, 46 of 352; www.applewoodcenters.org).

Plaintiff explained that DD was diligent about completing homework assignments and doing some chores.  She did not clean her room without her mother's supervision.  But DD did not have difficulty tending to her personal hygiene.  She showered daily and groomed herself.  She even permitted Plaintiff to style her hair.  DD showed little interest in her choice of clothing (Docket No. 12, p.50 of 352).

Plaintiff recounted that when ten years of age, DD had a meltdown, running  into the middle of the street while screaming and "acting crazy."  DD was transferred to MetroHealth Medical Center for a psychological assessment.  There it was determined that DD needed further hospitalization; however, a request for a transfer to the requisite patient care unit was denied because of DD's propensity for violence (Docket No. 12, p. 52 of 352).

Finally, Plaintiff claimed that she had benefitted from therapeutic intervention, learning how to cope with DD's erratic and unpredictable behavior.  The most important lesson learned was how

3

to defuse verbal or physical altercations before they escalated (Docket No. 12, pp. 47, 48 of 352).

## III. INTRODUCTION.

East Cleveland City Schools' records show that DD completed all of the required immunizations. Except for some tooth decay that had been treated or corrected, DD appeared normal on physical examination (Docket No. 12, pp. 186, 252 of 352). DD's records did not include an individualized educational plan created and designed to assist her with her unique educational needs (Docket No. 12, p. 51 of 352; www2.ed.gov/parents/needs/special/iepguide/index.html).

### IV. Educational background.

Nine months into DD's fourth grade school year, Ms. J. Thompson, a teacher at Chambers Elementary School (Chambers), an East Cleveland City School, completed a "Teacher Questionnaire" and noted that DD's overall functioning was appropriate for the fourth grade level. Specifically, DD read, completed math and written language assignments on a fourth grade level. There were infrequent absences during the fourth grade year and DD showed no problems with acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects or caring for herself. The school nurse at Chambers reported that Plaintiff had not reported any medical condition to the school. The school nurse was not aware of any medication prescribed for DD or that she took medication on a regular basis (Docket No. 12, pp. 176-183 of 352).

For the school year of 2008/2009, DD earned satisfactory performance marks in physical education, art, music, library skills and handwriting. DD's final grades in the core curriculum subjects were:

| | | |
|---|---|---|
| 1. | Reading | B |
| 2. | Math | A- |

4

|    |                |     |
|----|----------------|-----|
| 3. | Language       | A-  |
| 4. | Spelling       | A-  |
| 5. | Social Studies | A-  |
| 6. | Science        | A-  |

(Docket No. 12, pp. 213-215 of 352).

For the school year of 2009/2010, DD earned the final grades in these core curriculum subjects:

|    |                |   |
|----|----------------|---|
| 1. | Reading        | B |
| 2. | Math           | A |
| 3. | Language       | B |
| 4. | Spelling       | B |
| 5. | Social Studies | A |
| 6. | Science        | A |
| 7. | Health         | A |

DD obtained satisfactory marks on her work habits and behavior and attitude.  Although there were several un-excused absences, she had a satisfactory attendance record (Docket No. 12, pp. 238-239 of 352).

Ms. Susan A. Washington, a teacher at Chambers, completed and signed the SCHOOL ACTIVITIES QUESTIONNAIRE on April 26, 2011.  She was DD's classroom teacher during the sixth grade school year.  It was Ms. Washington's opinion that DD functioned on a sixth grade level and she had no difficulty "keeping up" with peers in sports, games and other extracurricular activities; however, DD needed "major" improvement in her behavior for the reasons that:

1. Occasionally, DD needed to work in another location to complete academic work;
2. Occasionally, DD could be extremely short and she exhibited signs of extreme lack of comprehension;
3. DD would follow instructions when she felt inclined to do so;
4. DD had problems working independently without disturbing others;
5. DD had the ability to understand and complete assignments on time but work was not always completed;
6. DD did not have the ability to respond to changes in routine and she did not respond well to criticism;

5

7.      DD progressed well with subjects if she was focused;

8.      DD would scream out if she heard a reply that she found disagreeable;

9.      DD could be extremely rude to peers by saying extremely negative things; and

10.     DD was prescribed glasses but she rarely wore them in class.

(Docket No. 12, pp. 243-244 of 352).

Ms. Washington completed a PROGRESS REPORT on May 3, 2011, for the fourth grading period of DD's sixth grade year.  DD's work habits had resulted in satisfactory performance in spelling, language, math, social studies, science, reading and completing homework.  Nevertheless, DD's behavior was unsatisfactory.  At times, she was extremely rude to peers and adults and occasionally, DD failed to complete homework assignments (Docket No. 12, p. 250 of 352).

## V.  TREATMENT FOR SOMATIC AND MENTAL DISORDERS.

On February 6, 2008, an initial psychiatric evaluation was conducted which highlighted some of the problems.  Apparently, at five years of age, DD and her mother had a house fire.  The family lost everything.  DD had been exposed to domestic violence between her biological father and his wife.  Afraid of fire and exposed to violence, DD inherently exhibited violence toward her family members and the family pet (Docket No. 12, pp. 269-273 of 352).

DD was diagnosed with a mood disorder, not otherwise specified, and attention deficit hyperactivity disorder (ADHD), combined type and conduct disorder, childhood onset.  Presumably, the examiner employed the Children's Global Assessment Scale (C-GAS) to rate DD's general level of functioning on a health-illness continuum.  DD had a:

> Moderate degree of interference in functioning in most social areas or severe impairment of functioning in one area, such as might result from, for example, suicidal preoccupations and ruminations, school refusal and other forms of anxiety, obsessive rituals, major conversion symptoms, frequent anxiety attacks, frequent episodes of aggressive or other antisocial behavior with some preservation of meaningful social relationships.  Http/depts.washington.edu/washinst/Resources/ CGAS/CGAS%20Index.htm).

6

(Docket No. 12, p. 272 of 352).

On February 12, 2008, Dr. Loan Kline, a resident, reviewed Plaintiff's concerns, DD's medical history and the results from a completed laboratory panel that was conducted on February 6, 2008.  The results did not generally exceed the reference range, except that DD's levels of hemoglobin and sodium levels were lower than the reference range, the level of mean platelet volume was higher than the reference range, and the levels of lymphocytes, a type of white blood cell, were higher than normal and her cholesterol levels were elevated (Docket No. 12, pp. 304-306 of 352; www.medical-dictionary.com).

Dr. Susan K. Santos, the attending physician, conducted a well-child examination on February 12, 2008.  Dr. Santos found that DD was generally healthy but diagnosed DD with ADHD and a bipolar disorder.  She suspected that DD had a learning disability and suggested that Plaintiff obtain testing at Applewood for clarification (Docket No. 12, pp. 306-309 of 352).

On March 13, 2008, Dr. Hal E. Wildman, Ph. D., a clinical psychologist, conducted a clinical evaluation of DD.  At the time, DD was 9.4 years of age.  She had been referred for evaluation to rule out ADHD and psychosis.  Five tests were administered:

1. KAUFMAN BRIEF INTELLIGENCE (KBI),
2. CHILD DEPRESSION INVENTORY (CDI),
3. REVISED CHILDREN'S MANIFEST ANXIETY SCALE (RCMAS),
4. MULTIDIMENSIONAL ANXIETY SCALE FOR CHILDREN (MASC) and
5. PIERS-HARRIS-2 (PH-2).

The results were:

1. KBI is a standardized intelligence quotient (IQ) test used to screen cognitive disabilities:
   a. DD's IQ was within the average range (85-115).
   b. DD's verbal score was with the below average range (70-84).
   c. DD's nonverbal IQ was within the average range.

2.      CDI is a self-report inventory that measures the level and nature of depression in children.  DD's pattern of responses yielded clinically significant scores on one of the five subscales (interpersonal problems) and approached significance on another (negative mood) but the total CDI score was not significant.

3.      RCMAS is a brief self-report inventory that measures the level and nature of anxiety in 6 to 19-year-olds.  DD endorsed items indicative of a nervous child with worries and fears more than other children her age.  This was the reason she had difficulty sleeping.

4.      MASC is a standardized self-report scale for measuring anxiety in children aged 8 to 15 years.  DD's pattern of responses was inconsistent; however, the score on the separation/panic index was within the clinically significant range which was suggestive of a child who is fearful of situations where her family members were not present and she may have fears of a variety of environmental stimuli.

5.      PH-2 is a 60-item self-report questionnaire designed to measure the construct of self-concept in children 7 to 18 years.  On the Behavioral Adjustment subscale, DD's score was indicative of a child who sees herself as frequently causing trouble and unable to adhere to standards of conduct set by the adults in her life.  DD was confident in her intellectual abilities, was satisfied with her physical appearance and generally had a more positive than negative appraisal of life.

Dr. Wildman diagnosed DD with a mood disorder, conduct disorder, ADHD, combined type (provisional), post-traumatic stress disorder, chronic, and separation anxiety disorder.  His perception of DD's general level of functioning on a health-illness continuum was that DD had a:

Moderate degree of interference in functioning in most social areas or severe impairment of functioning in one area, such as might result from, for example, suicidal preoccupations and ruminations, school refusal and other forms of anxiety, obsessive rituals, major conversion symptoms, frequent anxiety attacks, frequent episodes of aggressive or other antisocial behavior with some preservation of meaningful social relationships.  Http/depts.washington.edu/washinst/Resources/ CGAS/CGAS%20Index.htm).

It was Dr. Wildman's recommendation that DD undergo outpatient treatment for purposes of controlling verbal outbursts, medication for controlling the symptoms of ADHD and regular

coordination of treatment among all medical and mental health professionals (Docket No. 12, pp. 260-268 of 352; www.omh.ny.gov/omhweb/childservice/.../global_assessment_functioning.pdf.).

DD arrived at the emergency room on March 24, 2008.  She was having behavioral outbursts at home which included attempts to hurt others physically.  DD was acting out in the triage room, hitting her mother.  Plaintiff and DD were apparently in a public place and DD began hitting people without reason.  There was no level of intoxication and her hematology report was generally normal.  DD was discharged when her mood stabilized (Docket No. 12, pp. 298-302 of 352).

On March 28, 2008, Dr. Tatjana Drahotusky-Dodig, M. D., conducted a psychiatric examination, after which she reported that DD had a history of a bipolar disorder, depressed type with psychotic features and she was increasingly agitated and aggressive toward Plaintiff and her siblings.  Although DD was compliant with her medications, it was suggested that she undergo hospitalization for drug stabilization.  Dr. Drahotusky-Dodig expressed concern that there was some danger that DD would hurt herself or others (Docket No. 12, pp. 297-298 of 352).

On November 10, 2008, an individualized service plan was updated in collaboration with DD, incorporating weekly outpatient counseling services.  The goal of this therapeutic intervention was to give DD coping skills for her anger and to decrease mood symptoms (Docket No. 12, pp. 256-259 of 352).

On February 5, 2009, Plaintiff reported a difference in DD's behavior as a result of the medication.  The prescriptions were continued to specifically target DD's aggression and to stabilize her mood (Docket No. 12, pp. 274, 277 of 352).

DD was stable when she reported on March 3, 2009.  In fact, at home she was fighting less and had fewer outbursts.  She was irritable if she did not get her way (Docket No. 12, p. 275 of 352).

Also, on April 21, 2009, Dr. Vicki Casterline, Ph. D., completed a CHILDHOOD DISABILITY EVALUATION FORM, in which she commented that DD was doing well in school, she had no limitations in acquiring and using information, attending and completing tasks, interacting and relating with others and moving about and manipulating objects. Dr. Casterline diagnosed DD with an oppositional defiant disorder (ODD) and mood disorder, not otherwise specified. Neither the impairments nor the combination of impairments was medically equal to or functionally equal to the Listing (Docket No. 12, pp. 281-286 of 352).

On June 11, 2009, the examiner noted that DD had improved "as far as her moods go" and sleep was still an issue. The medication prescribed for purposes of stabilizing DD's mood was continued (Docket No. 12, pp. 315-316 of 352).

DD underwent a routine child health check on June 16, 2009. The examiner noted that DD had problems with prematurity and behavioral issues. Physically, no abnormalities were identified (Docket No. 12, pp. 291-295 of 352).

In the progress notes dated June 25, 2009, DD acknowledged that she can sometimes listen; that there were times when she could play with her sister without arguing and that she did not fight the last few days of school. Plaintiff agreed that some progress had been made but DD was masterful at performing well academically and then engaging in temper tantrums or mood swings (Docket No. 12, p. 312 of 352).

DD's progress was assessed on July 14, 2009. She was sleeping better and her appetite was good. Plaintiff noted that the intensity of DD's mood swings was improved and she was less aggressive although she continued to have occasional outbursts (Docket No. 12, p. 317 of 352).

On August 11, 2009, DD and Plaintiff had divergent views about her progress. DD claimed

10

that she was progressing "okay" while Plaintiff claimed she was doing "terrible."  Plaintiff recalled that DD had anger fits and mood swings which occurred at home and in public.  This was evidenced by the prolonged time during which DD was "on punishment."  The dosage of one of the mood stabilization drugs was increased.  DD had been taking her medication every day and she slept and ate "okay" (Docket No. 12, pp. 319-320 of 352).

On September 9, 2009, Dr. Paul Tangeman, Ph.D., completed CHILDHOOD DISABILITY EVALUATION FORM in which he diagnosed DD with ODD and mood disorder.  The impairment or combination of impairments was severe but did not meet or equal the listings.  Dr. Tangeman opined that there were no limitations in any of the four domains–acquiring and using information, attending and completing tasks, interacting and relating with others and moving about and manipulating objects.  Moreover, Dr. Tangeman determined that DD could care for herself and there were no limitations in her health and physical well-being (Docket No. 12, pp. 337-341 of 352).

On September 10, 2009, DD and Plaintiff again differed on DD's progress.  DD claimed she was doing "okay" and Plaintiff claimed she was doing "terrible."  Plaintiff explained that DD was taking her medication but the mood swings persisted (Docket No. 12, pp. 347-348 of 352).

During a counseling session on October 28, 2009, DD's birthday, it was noted that she was dressed appropriately and she resorted to childlike talk at times.  Only one classmate attended her birthday party and she threatened to beat the non-attendees up.  Plaintiff reported that DD has been playing with fire and she was rather nonchalant about this.  Reprimands were meaningless because DD generally resorted to the same behavior subsequent to the reprimand.  DD was more violent toward her sister.  DD was taking her medication daily without side effects (Docket No. 12, pp. 343-344 of 352).

11

DD and Plaintiff arrived twenty minutes late for a 30-minute appointment because DD was reluctant to attend the psychiatric session. Plaintiff reported that DD was out of control, voicing suicidal ideations. DD had refused to take her morning dosage of medication (Docket No. 12, pp. 345-346 of 352).

On January 26, 2010, DD presented to Applewood for counseling and medication monitoring. DD acknowledged that she was getting in trouble for "saying stuff," failing to complete chores and talking during class. DD admitted that she could be violent toward others, destructive toward her own and other's property, disrespectful and defiant toward her brother and spiteful. On the other hand, Plaintiff reported that DD actually exhibited aggression, rage, destruction, defiance, deceit and disrespect; DD was preoccupied with injustices, and she had mood swings, hygiene problems and crying spells. She was hyperactive, had poor impulse control, had trouble completing chores and had a propensity to lose things (Docket No. 12, pp. 232-233 of 352).

The pharmacological management plan was implemented on May 12, 2010. It was suspected that Plaintiff's current signs and symptoms would be reduced with the appropriate medications taken for a year. The plan was to conduct therapeutic intervention quarterly (Docket No. 12, pp. 230 of 352).

On June 29, 2010, the social worker/examiner noted that DD still had difficulties with anger problems. In particular, she took her anger out on members of her family, particularly her younger cousin who lived with them and was "always breaking somebody's stuff." Occasionally, she used the medications to make herself tired. Then she would whine and refuse to participate in counseling. When suited to her needs, she could turn the behaviors around to be cooperative. DD continued to have difficulty with controlling impulsivity and hyperactivity (Docket No. 12, p. 225 of 352).

A mental health assessment update was conducted on September 7, 2010 at the Applewood Center.  The presenting problem was DD's propensity for violence.  It was apparently escalating and she was becoming more violent with siblings.  Plaintiff and/or DD reported that *inter alia,* DD stole the neighbor's telephone, posted some sexually explicit pictures on Facebook and cut the braids from her hair.  The licensed social worker/examiner diagnosed DD with conduct disorder, childhood onset, bipolar disorder and ADHD (Docket No. 12, p. 221 of 352).

On September 20, 2010, it was recommended that DD undergo outpatient counseling weekly until she reduced the defiant and aggressive behaviors (Docket No. 12, p. 222 of 352).

Brigette R. Bulanda, a licensed social worker/clinical therapist, completed a QUESTIONNAIRE HEALTH CARE PROFESSIONALS ON MEDICAL AND FUNCTIONAL EQUIVALENCE form on November 2, 2010.  Having known DD for approximately two years, Ms. Bulanda commented that DD had a bipolar disorder, ODD and ADHD, combined.  The side effects of DD's medications included sleepiness, "reduced hyperactivity," impulsivity and inattention and mood stabilization.  Ms. Bulanda described the severity of her development in the functional domains:

1.  DD had an extreme limitation in her ability to acquire and learn information, particularly since she learned information but did not put it into practice.

2.  DD had a marked limitation in attending and completing tasks because she was easily distracted.  DD could begin activities but rushed and often did not compete the tasks without constant supervision.

3.  DD was a thief, who destroyed her own  property and that of others.  Extremely limited in her ability to interact and relate with others, DD bullied her school mates and family.

4.  There was no evidence of DD's limitations in her ability to move about and manipulate objects.

5.  DD had an extreme limitation in caring for herself because her needs were met through defiance and tantrums.  DD did not cope well with change.

13

6.      There was no evidence of limitations in her health and physical well-being.

(Docket No. 12, pp. 349-352 of 352).

## V. STANDARD OF DISABILITY.

An individual under the age of 18 shall be considered disabled for purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i) (Thomson Reuters/West 2012).  The steps in evaluating disability for children:

> We consider all relevant evidence in your case record when we make a determination or decision whether you are disabled.  If you allege more than one impairment, we will evaluate all the impairments for which we have evidence. Thus, we will consider the combined effects of all your impairments upon your overall health and functioning.  We will also evaluate any limitations in your functioning that result from your symptoms, including pain (see § 416.929).  We will also consider all of the relevant factors in §§ 416.924a and 416.924b whenever we assess your functioning at any step of this process.  We follow a set order to determine whether you are disabled.  If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further.  If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe.  If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further.  **If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals the listings**.  If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled.

20 C.F.R. § 416.924(a) (Thomson Reuters 2012).

If the child has a severe impairment or combination of impairments that does not meet or medically equal any listing, the SSA will find an impairment functionally equivalent to a Listing if the child has an extreme limitation in one area of functioning, or a marked limitation in two areas of functioning.  20 C.F.R. § 416.926a(b)(2) (Thomson Reuters/West 2012).  If the child has a severe impairment or combination of impairments that does not meet or medically equal any listing, SSA

14

will decide whether it results in limitations that functionally equal the listings.  20 C. F. R. § 416.926a (a) (Thomson Reuters 2012).  By "functionally equal the listings," SSA means that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, as explained in this section.  20 C. F. R. § 416.926a (Thomson Reuters 2012).

### VII. THE ALJ'S FINDINGS.

Upon consideration of the evidence, the ALJ made the following findings:

1.      DD was born on October 28, 1998.  Therefore, she was a school-age child on March 2, 2009, the date the application was filed, and she is currently an adolescent (20 C.F.R. § 416.926a(g)(2)).

2.      DD had not engaged in substantial gainful activity at any time relevant to the decision (20 C.F.R. §§ 416.924(b) and 416.971 *et seq*.).  DD is a minor and has never worked.

3.      DD had the following severe impairments:  ODD, Mood disorder (Bipolar II) and Affective Disorders (20 C.F.R. § 416.924(c)).

4.      DD did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924, 416.925, and 416.926).

5.      DD did not have an impairment or combination of impairments that functionally equaled the listings (20 C.F.R. §§ 416.924(d) and 416.926a).

6.      DD had not been disabled, as defined in the Act, since March 2, 2009, the date the application was filed (20 C.F.R 416.924(a)).

(Docket No. 12, pp. 18-26 of 352).

Once the Appeals Council denied Plaintiff's request for review of this decision, the ALJ's decision became the final decision of the Commissioner.

## VI.  STANDARD OF REVIEW.

Under 42 U.S.C. § 405(g), a district court is permitted to conduct judicial review over the final decision of the Commissioner.  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record.  *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)).  The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion."  *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981)

16

*cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner*, 375 F.3d at 390) (*quoting Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## VIII. DISCUSSION.

Plaintiff contends that this case should be remanded for an award of benefits because:

1. Substantial evidence proves that DD's ADHD meets LISTING 112.04 and DD's bipolar disorder meets LISTING 112.11.
2. Substantial evidence proves that DD's ADHD, ODD and bipolar disorder caused marked impairments of at least two domains which resulted in functional equivalency and disability.
3. The ALJ wrongfully ignored the weekly counseling with a therapist and monthly psychotherapy with a psychiatrist.

Defendant argues:

1. Substantial evidence supports the ALJ's findings that Plaintiff's impairments did not meet Listings 112.04 and 112.11.
2. The ALJ complies with the regulations when weighing the record evidence.

**1. DOES DD'S MOOD DISORDER MEET OR EQUAL LISTINGS 112.04 AND/OR 112.11?**

Plaintiff argues that this case should be remanded for an award of benefits because substantial evidence proves that DD's bipolar disorder meets 112.04 of the LISTING and DD's ADHD meets or equals LISTING 112.11. Plaintiff suggests that it would be futile to remand this case to the Commissioner for further evaluation because the record is complete, the decision that DD's impairments do not meet 112.04 and/or 112.11 of the LISTING is clearly erroneous, proof of disability is strong, the evidence to the contrary is lacking and overwhelming evidence of disability has been presented.

Defendant contends that reports and the therapy notes during the relevant time period from March 1, 2009 to February 7, 2011, fail to reveal any marked limitations. Thus, there is substantial

17

evidence to support the ALJ's decision that DD's impairments do not meet or equal LISTING 112.04 or 112.11.

For purposes of resolution, the Magistrate addresses whether DD's disorders meet or equal the LISTINGS collectively.

### THE LAW--LISTING 112.04

LISTING 112.04 applies to mood disorders which are characterized by a disturbance of mood (referring to a prolonged emotion that colors the whole psychic life, generally involving either depression or elation), accompanied by a full or partial manic or depressive syndrome. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.04 (Thomson Reuters 2012). The required level of severity for these disorders is met when the requirements in both A and B are satisfied. *Id.*

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

1.  **Major depressive syndrome**, characterized by at least five of the following, which must include either depressed or irritable mood or markedly diminished interest or pleasure:
    a.  Depressed or irritable mood; or
    b.  Markedly diminished interest or pleasure in almost all activities; or
    c.  Appetite or weight increase or decrease, or failure to make expected weight gains; or
    d.  Sleep disturbance; or
    e.  Psychomotor agitation or retardation; or
    f.  Fatigue or loss of energy; or
    g.  Feelings of worthlessness or guilt; or
    h.  Difficulty thinking or concentrating; or
    i.  Suicidal thoughts or acts; or
    j.  Hallucinations, delusions, or paranoid thinking;

    OR

2.  **Manic syndrome**, characterized by elevated, expansive, or irritable mood, and at least three of the following:
    a.  Increased activity or psychomotor agitation; or
    b.  Increased talkativeness or pressure of speech; or
    c.  Flight of ideas or subjectively experienced racing thoughts; or
    d.  Inflated self-esteem or grandiosity; or

      e.      Decreased need for sleep; or

      f.      Easy distractibility; or

      g.     Involvement in activities that have a high potential of painful consequences which are not recognized; or

      h.     Hallucinations, delusions, or paranoid thinking;

OR

3.     **Bipolar or cyclothymic syndrome** with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently or most recently characterized by the full or partial symptomatic picture of either or both syndromes);

AND

B.     For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

#### THE LAW--LISTING 112.11

In order to show that a child meets LISTING 112.11 for ADHD, Plaintiff must present:

**A**.  Medically documented findings of all three of the following:

      1.     Marked inattention; and

      2.     Marked impulsiveness; and

      3.     Marked hyperactivity.

*Sailes ex rel. A.H. v. Astrue*, 2012 WL 1066776, *3 (N.D.Ohio,2012) (*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, LISTING 112.11(A)).  Once medical documentation of all three criteria in Part A of LISTING 112.11 is met, a plaintiff must also show that child at the time of filing of his or her application for SSI and at the time of the ALJ's decision, had at least two of the following criteria in LISTING 112.02**B**.2:

      a.     Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age six, by appropriate tests of language and communication; or

      b.     Marked impairment in age-appropriate social functioning, documented by history

19

and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c.      Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d.      Marked difficulties in maintaining concentration, persistence, or pace.

*Id.* (*citing* LISTING 112.02B.2.).

The term "marked" in this context means more than moderate but less than extreme. *Id.* A marked limitation may arise when several activities or functions are impaired so long as the degree of limitation is such as to interfere seriously with the ability to function based on age-appropriate expectations independently, appropriately and effectively and one a sustained basis. *Id.*

THE RESOLUTION OF THIS ISSUE.

In the instant case, the ALJ stated:

"The undersigned has considered the claimant's attention deficit hyperactivity disorder under Section 112.11, *Attention Deficit Hyperactivity Disorder;* the undersigned also considered the claimant's diagnosis of oppositional defiant disorder under section 112.08, *Personality Disorders (Oppositional Defiant Disorder)*; the undersigned also considered Section *112.04, Mood Disorders*. The undersigned finds that the evidence does not meet or equal a listing. The evidence does not substantiate that claimant has at least two marked impairments in the areas of cognitive/communicative functioning, social functioning, personal functioning, or maintaining concentration, persistence or pace as required to meet the listing criteria described "

Based on these superficial statements and minimal findings, the Magistrate cannot conduct meaningful judicial review. Stated differently, the Magistrate cannot discern whether the ALJ actually evaluated the evidence and compared it to Sections 112.04 and 112.11 of the LISTING or the ALJ skipped the third step of the analysis altogether (Plaintiff does not contest the finding under

Section 112.08).  Assessment of the sufficiency of evidence at step three is not merely a formalistic matter of procedure, for it is possible that it would have been the basis a finding that DD met one or both of the LISTINGS.  The regulations indicate that if DD had been found to meet a Listed Impairment, she would be considered disabled within the meaning of the regulations and therefore entitled to benefits regardless of what other conclusions the ALJ would have made in the following analysis.

In short, the ALJ needs to actually evaluate the relevant evidence, compare it to Sections 112.04 and 112.11 of the LISTING and give an explained conclusion of whether the evidence is sufficient to make a finding under the LISTING.  Without this evaluation, it is impossible for the Magistrate to say that the ALJ's decision at step three was supported by substantial evidence.  The Commissioner's decision is vacated and remanded for a discussion of the evidence and an explanation of reasoning supporting the determination that DD's impairments are severe and whether her impairments, individually or collectively, meet or medically equal a listed impairment.

This finding does not grant  Plaintiff's request that the case be reversed and an award of benefits automatically ordered.  Benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Lambert ex rel. Lambert v. Commissioner of Social Security*, 2012 WL 966060, *17 (S.D.Ohio,2012) (*citing Faucher v. Secretary of Health & Human Services*, 17 F.3d 171, 176 (6th Cir.1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir.1990)).  The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Id.* (*citing Faucher*, 17 F.3d at 176; *see also Felisky v. Bowen*, 35 F.3d

1027, 1041 (6th Cir.1994)).

Recounting the educational and medical evidence in this case, there are essential factual issues that should be considered by the ALJ, not this Court. For instance, no medical source has categorized DD's limitations as "marked" in the areas of age-appropriate cognitive and communicative function, social function, personal instruction, persistence or pace. Similarly, no examining or treating source, or non-examining consultant has opined that DD met or equaled this LISTING. However, there is other evidence that may be probative of a disability finding under the LISTING. The ALJ is empowered to make a full inquiry into DD's case and resolve any factual disputes arising from the countervailing evidence. The Magistrate cannot operate as factfinder for this disability claim. Thus, the matter is not remanded for purposes of entering an award of benefits.

    **2.**    **IS THERE SUBSTANTIAL EVIDENCE THAT PROVES THAT DD'S ADHD, ODD AND BIPOLAR DISORDER CAUSED MARKED IMPAIRMENTS IN AT LEAST TWO DOMAINS?**

Plaintiff argues that as a matter of law, DD's severe impairments resulted in marked limitations in the functional domains of attending and completing tasks, caring for herself and interacting and relating to others.

### THE LAW.

An assessment of the functional limitations caused by the child's impairments will be made, for example, based upon what the child cannot do, what the child has difficulty doing or needs help doing, or are restricted from doing because of his or her impairment(s). 20 C. F. R. § 416.926a(a) (Thomson Reuters 2012). When making a finding regarding functional equivalence, SSA will assess the interactive and cumulative effects of all of the impairments for which there is evidence, including any impairments the child has that are not "severe." 20 C. F. R. § 416.924(c) 416.926a(a) (Thomson Reuters 2012). Assessing functional limitations, SSA will consider all the relevant

22

factors in §§ 416.924a, 416.924b, and 416.929 including, but not limited to:

(1)     How well the child can initiate and sustain activities, how much extra help the child needs, and the effects of structured or supportive settings (*see* § 416.924a(b)(5).

(2)     How the child functions in school (*see* § 416.924a(b)(7); and

(3)     The effects of your medications or other treatment (*see* § 416.924a(b)(9).

SSA will look at the information in the child's case record about how his or her functioning is affected during performance of all activities when deciding whether the impairment or combination of impairments functionally equals the listings.  20 C. F. R. § 416.926a(b) (Thomson Reuters 2012).  The child's activities are everything done at home, at school, and in the community. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2012).  SSA will consider how the child appropriately, effectively, and independently performs activities compared to the performance of other children his or her age who do not have impairments.  20 C. F. R. § 416.926a(b) (Thomson Reuters 2012). Consideration will be given to how the child functions in activities in terms of six domains.  20 C. F. R. § 416.926a(b) (Thomson Reuters 2012).  The domains are:

(i)     Acquiring and using information;
(ii)    Attending and completing tasks;
(iii)   Interacting and relating with others;
(iv)    Moving about and manipulating objects;
(v)     Caring for yourself; and,
(vi)    Health and physical well-being.

20 C. F. R. § 416.926a(b) (1) (i), (ii), (iii), (iv), (vi) (Thomson Reuters 2012).

When assessing whether the child can function in each domain, SSA will ask for and consider information that will help answer the following questions about whether the child's impairment(s) affects the child's functioning and whether the activities are typical of other similarly aged children who do not have impairments.

23

(i)     What activities are you able to perform?

(ii)    What activities are you not able to perform?

(iii)   Which of your activities are limited or restricted compared to other children your age who do not have impairments?

(iv)    Where do you have difficulty with your activities-at home, in childcare, at school, or in the community?

(v)     Do you have difficulty independently initiating, sustaining, or completing activities?

(vi)    What kind of help do you need to do your activities, how much help do you need, and how often do you need it?

20 C. F. R. § 416.926a(b)(2)(i), (ii), (iii), (v), (vi) (Thomson Reuters 2012).

SSA will decide that a child's impairment(s) functionally equals the listings if the impairment is of listing-level severity. 20 C. F. R. § 416.926a(d) (Thomson Reuters 2012).  The child's impairment(s) is of listing-level severity if he or she has "marked" limitations in two of the domains in paragraph (b)(1) of this section, or an "extreme" limitation in one domain.  20 C. F. R. § 416.926a(d) (Thomson Reuters 2012).

The term "marked" means a limitation in a domain when the child's impairment(s) interferes seriously with his or her ability to independently initiate, sustain, or complete activities.  20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2012).  The child's day-to-day functioning may be seriously limited when his or her impairment(s) limits only one activity or when the interactive and cumulative effects of the child's impairment(s) limit several activities.  20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2012).  "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."  20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2012).

"Extreme" limitation means a limitation that is "more than marked." 20 C. F. R. § 416.926a(e)(2)(i) (Thomson Reuters 2012).  It does not necessarily mean a total lack or loss of ability to function. 20 C. F. R. § 416.926a(e)(3)(i) (Thomson Reuters 2012). SSA will find that the child has an "extreme" limitation in a domain when his or her impairment(s) interferes very

seriously with his or her ability to independently initiate, sustain, or complete activities.  20 C. F. R. § 416.926a(e) (3)(i) (Thomson Reuters 2012).  The day-to-day functioning may be very seriously limited when the child's impairment(s) limits only one activity or when the interactive and cumulative effects of his or her impairment(s) limit several activities.  20 C. F. R. § 416.926a(e)(3)(i) (Thomson Reuters 2012).

   Without expressing an opinion on the sufficiency or materiality of the evidence, the Magistrate finds that the ALJ erred in assessing DD's functional equivalence.  The ALJ recited the law and then provided a one line conclusion that DD had no limitation within that particular domain.  The ALJ failed to acknowledge what evidence, if any, was used to determine that the DD had an extreme or marked limitation in any of the prescribed domains.  The Magistrate cannot ascertain the basis of the ALJ's decision or if it is based on substantial evidence.  The Commissioner's decision is vacated and remanded for a discussion of how DD functions in the broad range of domains that capture what she can and cannot do and then whether, based on substantial evidence, DD's impairments are or are not functionally equal to comparable listing-level severity that would disable her.

3. DID THE ALJ COMMIT SUBSTANTIAL ERROR BY IGNORING THE TREATING PHYSICIAN RULE?

   Plaintiff argues that the ALJ did not identify the treating physician or explain the weight attributed the treating physician's opinions.

THE LAW.

   To qualify as a treating source, the acceptable medical source must have examined the claimant and engaged in an ongoing treatment relationship with the claimant consistent with accepted medical practices. *McCombs v. Commissioner of Social Security,* 2010 WL 3860574, *6

(S. D. Ohio 2010) (*citing Smith v. Commissioner of Social Security*, 482 F.3d 873, 875 (6th Cir. 2007) (*quoting* 20 C.F.R. § 404.1502)).  The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances.  *Cross v. Commissioner of Social Security*, 373 F. Supp.2d 724, 729-730 (N. D. Ohio 2005).

Generally, more weight is attributed to treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Id.* (*citing* 20 C.F. R. § 404.1527(d)(2)).  In fact, if such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. *Id.* (*citing* 20 C. F. R. § 404. 1527(d)(2)).

When the treating source does not receive controlling weight, the agency must give good reasons for not affording controlling weight to the treating source's opinion in the context of a disability determination. *Id.* (*citing Wilson*, *supra*, 378 F. 3d at 544).  To meet the obligation to give good reasons for discounting the treating source's opinion, the ALJ must do the following:

- State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.
- Identify evidence supporting such finding.
- Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion.

Section 404.1527(d) explains that the agency will evaluate every medical opinion and weigh the following factors in deciding what weight to give any medical opinion from a physician in a

treatment relationship:

- Nature and extent of the treatment relationship
- Supportability
- Consistency
- Specialization
- Other factors.

Plaintiff's argument has merit for the reason that the ALJ misidentified Dr. Wildman as a treating physician.  There is no treatment relationship sufficient to justify giving controlling weight to Dr. Wildman's opinions.  DD was referred to Dr. Wildman for a psychological evaluation to clarify DD's diagnoses and to rule out psychoses (Docket No. 12, pp. 260-268 of 352).  There was no reason for the ALJ to articulate in any detail the weight given to Dr. Wildman's opinions and the reasons for the limited weight given them.

The Magistrate finds, however, that the ALJ appeared to selectively choose what evidence to consider, giving only cursory consideration to DD's continued treatment or counseling.  While the ALJ need not mention every item of evidence that supports the decision, it is clear from the ALJ's decision that he ignored entire lines of other evidence.  His conclusions are based solely on the reports from the consultative examiners, Drs. Casterline, Tangeman and Wildman.  It appears clear from his decision that the ALJ failed to follow the correct legal standards in assessing all of the evidence, discounting it where appropriate and giving it appropriate weight when it was deserved.  On remand, the ALJ must properly consider the subjective complaints and all of the medical evidence when determining if DD is disabled.

## IX. CONCLUSION

For the foregoing reasons, the Commissioner's decision is reversed and this case is remanded to the Commissioner pursuant to sentence four of 42 U. S. C. § 405(g), to:

27

1.      consider all of the evidence and supplement the record with whatever is needed to inquire fully into the issues;

2.      determine whether DD has a severe impairment or combination of impairments that meets or medically equals any listing or if DD's impairments are functionally equivalent to a Listing; and

3.      determine whether DD is disabled as defined in the Act using the appropriate regulations and making explained conclusions.

**IT IS SO ORDERED.**


/s/ Vernelis K. Armstrong
United States Magistrate Judge


Date:   December 10, 2012.